**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
PETER SOLOMON,

                    Plaintiff,

          -against-

NASSAU COUNTY; NASSAU COUNTY
CORRECTIONAL CENTER; and SHERIFF
EDWARD REILLY and, UNDERSHERIFF
MICHAEL SPOSATO, individually and In their
official capacities,

                  Defendants.
--------------------------------------------------------X

**MEMORANDUM OF DECISION AND ORDER**
08-CV-703 (ADS)(ARL)

**<u>APPEARANCES:</u>**

**Paul T. Layton, Esq.**
*Attorney for the Plaintiff*
30 Vesey Street (suite 1803)
New York, NY 10007

**Law Offices of Ambrose Wotorson**
*Attorney for the Plaintiff*
26 Court Street, Suite 1811
Brooklyn, NY 11242-1118
       By:  Ambrose W. Wotorson, Esq.

**John Ciampoli, Nassau County Attorney**
*Attorneys for the Defendants*
One West Street
Mineola, NY 11501
       By:    Assistant Nassau County Attorney Donna A. Napolitano
               Assistant Nassau County Attorney Ryan Singer
               Assistant Nassau County Attorney Liora M. Ben-Sorek

**SPATT, District Judge.**

      The plaintiff Peter Solomon ("Solomon" or the "Plaintiff"), a former pre-trial inmate at

the Nassau County Correctional Center ("NCCC"), commenced this action against the remaining

defendants Nassau County, NCCC, Sheriff Edward Reilly ("Reilly"), and Undersheriff Michael

Sposato ("Sposato") pursuant to 42 U.S.C. § 1983 ("Section 1983") alleging that his civil rights

were violated when he was bitten by a rodent in his jail cell.  Solomon also asserted causes of action for negligence under New York State law.  The defendants now move for summary judgment dismissing:  1) all claims against the NCCC because it is a non-suable entity; 2) all claims against Reilly and Sposato in their official capacities because they are duplicative of the claims against Nassau County; 3) all claims against Reilly and Sposato in their individual capacities because the Plaintiff has not provided any evidence of their individual involvement; and 4) the Section 1983 and state-law negligence causes of action because there are no genuine issues of material fact.  For the reasons set forth below, the Court grants in part and denies in part the defendants' motion.

## I.  BACKGROUND

The following facts are drawn from the parties' submissions in this case.  As is required on a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party, the Plaintiff.

### A.  Solomon's Incarceration and the Rodent Bite

On February 13, 2007, Solomon was admitted as a pretrial detainee to the NCCC.  From February 13, 2007 until February 21, 2007, Solomon was housed on a floor for newly admitted prisoners.  Based on the medical information Solomon provided to the NCCC upon admission, Solomon was transferred on February 21, 2007 to the Mental Observation Unit ("MOU"), and placed in cell E1C32.  Also, on February 21, 2007, Solomon met with an NCCC doctor and requested sleeping medication for insomnia.  Based on Solomon's medical history as well as other circumstances, the doctor declined to provide Solomon with sleeping medication.

On February 22, 2007, at approximately 11:30pm, Solomon alleges that a rodent emerged from a hole in his mattress while he slept and bit him on the penis.  Solomon pulled the rodent

from his penis and threw it away from him.  Correctional officers Robert Pascucci ("CO

Pascucci") and Charles Califano ("CO Califano") responded to Solomon's request for assistance.

CO Califano immediately brought Solomon to the NCCC medical clinic for examination.

Subsequently, Solomon was admitted to the Nassau University Medical Center where his injuries

were treated and he received rabies shots.  The parties dispute whether the rodent was a mouse or

a rat, whether Solomon was bitten or scratched by the rodent, and the nature and extent of his

injuries.  After the incident, Solomon was moved to a number of different cells and was

ultimately released from the NCCC on March 23, 2007.

**B.  Nassau County and NCCC Rodent Control Policy**

At the time of Solomon's injury, Nassau County and the NCCC had a pest control policy

known as the Integrated Pest Management ("IPM plan" or "IPM policy").  This policy was

adopted by the NCCC in 1997, at which time Nassau County contracted with Bug Free

Exterminating and Tree Spraying, Inc. ("Bug Free") to provide the pest and rodent control

services at the NCCC under the IPM policy.  The NCCC policies and procedures memorandum

defines the IPM plan as:

> [A] systematic approach to managing pests that focuses on long-
> term suppression or prevention, with a minimal impact on health,
> environment, and non-target organisms.   IPM incorporates all
> reasonable measures to prevent pest problems by properly
> identifying pests, monitoring population dynamics, and utilizing
> cultural, physical, biological, or chemical pest population methods
> to reduce pests to acceptable levels.

(Weinick Decl., Ex. O.)  As part of the IPM policy, NCCC officials are required to comply with

additional preventative measures to ensure sanitary conditions and to maintain the facility in

such a manner as to prevent pests from entering the facility (the "Housekeeping Policy").

(Weinick Decl., Ex. P.)  The Court notes that, while the requirements of the IPM plan are not in

dispute, the parties disagree about the proper application and effectiveness of the IPM plan in preventing rodents from entering inmate cells.

The NCCC follows specific procedures in order to implement its IPM policy for rodent control:  1) trash is removed from the facility after each meal; 2) inmates are required to sweep and mop the floors three to four times a day; 3) door sweeps are installed throughout the exterior doors of the facility to prevent rodent access, particularly at the kitchen where the most likely points of entry for rodents are located; 4) glue boards and other monitors are strategically placed near vents, doors, pipes and other access points to trap rodents before they enter the facility; 5) a Bug Free exterminator is escorted throughout the facility six times a month to assess problem areas and effect treatments NCCC staff are not qualified to implement; and 6) NCCC maintenance personnel respond to specific complaints by correction officers or inmates by performing maintenance on areas where there are complaints.  (Def. 56.1 Stmt. ¶¶ 66, 72–75, 94.)

The owner of Bug Free, Bert Garcia ("Garcia"), although not always directly involved in the extermination at the facility, is ultimately responsible for overseeing Bug Free's role in implementing the IPM policy.  At the time of Solomon's injury in February 2007, Patrick Starke ("Starke"), the current NCCC maintenance supervisor, was the maintenance mechanic primarily responsible for working with Bug Free to prevent and control the pest population.  At the end of 2006 and the beginning of 2007, Bug Free would come to the NCCC once a week during the day, and twice a month in the evenings for approximately five to six hours.  During the course of these visits, Bug-Free installed "glue boards" to monitor for rodent activity, and inspected, among other locations, the loading docks, stairwells, kitchens, and dormitories.  Consistent with

NCCC policy, Bug Free could not place poisons or install glue boards in locations where prisoners had access.

As discussed below, Solomon alleges that the IPM policy and its implementation were insufficient in preventing rodents from entering inmate common areas and cells. Solomon further alleges that NCCC officials were aware that the policy was not preventing rodents from entering the facility, and therefore knew there was a substantial risk that one of the rodents would bite an inmate, exposing the inmate to a number of diseases, including rabies. Based on these allegations, Solomon commenced the instant action on February 19, 2008 alleging that Nassau County, the NCCC, Sheriff Reilly and Undersheriff Sposato violated his Fourteenth Amendment Due Process rights and were negligent under New York State law. The defendants seek dismissal of all claims against the NCCC, Reilly, and Sposato on predominantly procedural grounds, and dismissal of all claims against Nassau County because there is no evidence supporting the Section 1983 or state law negligence claims, and there is no support for holding Nassau County liable for any alleged violations. Their objections are discussed in turn below.

## II. DISMISSAL OF PARTIES

The defendants' motion for summary judgment requests dismissal of: 1) all causes of action against the NCCC because the NCCC is a non-suable entity; and 2) all causes of action against the individual defendants Reilly and Sposato in both their official and individual capacities. In his opposition, the Plaintiff consented to the dismissal of the NCCC, and the dismissal of the suit as against Sposato and Reilly in their official capacities. The Plaintiff was not clear as to whether he also consented to the dismissal of the claims against Sposato and Reilly in their individual capacities.

The defendants claim that, even if the Plaintiff did not intend to dismiss the claims against Sposato and Reilly in their individual capacities, the Court should nevertheless grant the dismissal because the Plaintiff failed to allege personal involvement by either defendant directly relating to the alleged rights violation.  In the complaint, the Plaintiff asserts that Sposato and Reilly "directed and were aware of all of the unconstitutional operations, customs and policies at [the] NCCC" relating to pest control, and that they were "responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of" with regard to the pest control policies.  (Compl. ¶¶ 8, 9.)  The Court views these facts as allegations against Sposato and Reilly based on their supervisory roles.  The Second Circuit has held that in the context of Section 1983 claims alleging due process violations:

> supervisors may be 'personally involved' in the constitutional torts of their supervisees if: (1) the supervisory official, after learning of the violation, failed to remedy the wrong; (2) the supervisory official created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (3) the supervisory official was grossly negligent in managing subordinates who caused the unlawful condition or event.

Spencer v. Doe, 139 F.3d 107, 112 (2d Cir. 1998).  Because the Plaintiff has not provided any evidence that Sposato and Reilly were "personally involved" in any alleged failure to maintain a safe prison environment, the Court dismisses the claims against Sposato and Reilly in their entirety.  Thus, the Court only addresses the sufficiency of the remaining causes of action as against Nassau County (the "Defendant").

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Legal Standard

It is well-settled that summary judgment under Fed. R. Civ. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. Matsushita, 475 U.S. at 586. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

**B.  The Section 1983 Claim**

Solomon alleges that Nassau County, a municipality, through its management of the NCCC, violated his Due Process right under the Fourteenth Amendment by exhibiting deliberate indifference to his health and safety in failing to adequately protect him from rodents during his incarceration at the NCCC.  Specifically, Solomon claims that the Defendant was aware of a significant rodent problem in the MOU where the Plaintiff was housed, and its failure to correct the problem resulted in the injuries the Plaintiff sustained to his penis and testes when he was attacked by a rodent.  Because the Plaintiff's Section 1983 claim is against a municipality, the Plaintiff must demonstrate the existence of material fact as to both the constitutional violation and whether Nassau County can be held liable under the standard set forth in Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978) ("Monell Liability").  The Court addresses each issue in turn below.

**1.  As to the Constitutional Violation**

The Plaintiff brings this action pursuant to 42 USC § 1983 ("Section 1983") claiming that the insufficient rodent control policies at the NCCC created a substantial risk that the Plaintiff would be seriously harmed by a rodent bite, and that the Defendant was aware of this risk and failed to take reasonable measures to protect him.  A Section 1983 claim requires that a plaintiff allege deprivation of a constitutional or statutory right by a person acting under "color of any statute, ordinance, regulation, custom, or usage, of any State or Territory"  42 U.S.C. §1983; Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999) ("To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right.").  Section 1983 "is not itself a source of substantive rights, but merely provides a method for

vindicating federal rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393–94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (internal quotation marks and citation omitted).

Where, as here, the plaintiff is a pre-trial detainee as opposed to a convicted inmate, courts analyze allegations that state level prison officials were deliberately indifferent to prison conditions that create a substantial risk of serious harm under the Fourteenth Amendment's Due Process Clause.  See Caiozzo v. Koreman 581 F.3d 63, 71 (2d Cir. 2009).  To prevail on a Fourteenth Amendment conditions of confinement claim, the plaintiff must satisfy an objective requirement that he "lacked the minimal civilized measure of life's necessities while confined" and must also meet a subjective requirement by showing that "the person responsible for this deprivation acted with knowledge and deliberate indifference."  Martin v. County of Nassau, 692 F. Supp. 2d 282, 295 (E.D.N.Y. 2010).  A prison official demonstrates deliberate indifference to prison conditions if he or she "knows of and disregards an excessive risk to inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994).

### a.  Whether the Plaintiff was exposed to a Substantial Risk of Serious Harm

The Defendant contends that the Plaintiff cannot show that conditions at the NCCC presented a substantial risk of serious harm because:  1) the evidence reflects that there are no rats at the NCCC and therefore the Defendant could not be aware of a non-existent condition; and 2) even if rats were present, rats do not create a risk of serious harm because the Plaintiff's injury was not serious.  As an initial matter, for the purposes of this motion, the Court does not distinguish between mice and rats.  The Plaintiff has asserted that "the incident involving plaintiff, be it by rat or mouse, was a serious incident."  (Pl.'s Br. at 13.)  Although the Defendant may intend to offer evidence at trial that a mouse bite, as opposed to a rat bite, does

9

not present a serious risk of harm, such evidence was not presented to this Court on the current

motion.  Thus, the Court will address the evidence relating to rodents generally.

The objective substantial risk prong of the inquiry can be satisfied by a showing that the

"prison officials expose[d] prisoners to conditions that 'pose an unreasonable risk of serious

damage to [their] future health.'"  Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (citing

Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 2475, 125 L. Ed. 2d 22 (1993)).  The

substantially serious standard contemplates a "condition of urgency, one that may produce death,

degeneration or extreme pain."  Chance v. Armstrong 143 F.3d 698, 702 (2d Cir. 1998);

Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994); see also Varricchio v. Cnty. of Nassau,

702 F. Supp 2d 40, 56 (E.D.N.Y. 2010).  Unsanitary conditions at a prison facility such as, lack

of toiletries, exposure to cold, rodents and human waste can present a risk sufficient for Section

1983 liability.  See Gaston v. Coughlin, 249 F.3d 156, 166 (2d Cir. 2001) (collecting cases).

However, conditions that are temporary or occasional, such as the mere "presence of rodents"

without more have been found not to constitute "a sufficiently serious deprivation" to sustain a

Section 1983 deliberate indifference claim.  Higgins v. Coombe, No. 94-CV-7942, 1996 WL

502409, at *3 (S.D.N.Y. Sept. 4 1996); see, e.g., Trammel v. Keane, 338 F.3d 155, 164 (2d Cir.

2003) (holding that an allegation that the plaintiff's toiletries were not replenished over a period

of nine days was insufficient to sustain a claim); Davidson v. Murray, 371 F. Supp. 2d 361

(W.D.N.Y. 2005); Sylla v. City of New York, No. 04-CV-5692, 2005 WL 3336460 (E.D.N.Y.

Dec. 5 2005).

Although the Defendant argues that the alleged rodent problem at the NCCC was either

non-existent or minimal, the Plaintiff has provided evidence of formal and informal grievances

as well as testimony by CO Califano regarding the presence of rodents that creates a material

issue of fact as to whether the Plaintiff was exposed to a substantial risk of contracting rabies or another dangerous disease from a rodent bite.  For example, the Plaintiff cites 11 formal inmate grievances regarding the presence of rodents in the facility within the 23 months prior to the Plaintiff's injury, including:  a petition by 50 inmates complaining about the presence of rodents; an instance where an inmate found a rodent part in his meal; and a situation where an inmate was bitten by a mouse and subjected to painful swelling.  (Upton Decl., Ex. F.)  With regard to informal grievances, CO Califano testified that, since he was first assigned to the MOU, he has received at least one hundred informal complaints from inmates regarding the presence of rodents in the cells.  (Califano Dep.  82:13–24.)  Although the Defendant questions the credibility of these grievances, for the purposes of this motion the Court accepts them as true.

The Defendant argues that because the one hundred informal complaints cited by CO Califano occurred over the course of 16 years, and the 11 formal grievances occurred over the course of 23 months, the mathematical breakdown suggests the instances of rodent sightings and injuries are infrequent.  However, there is no indication that the complaints were evenly distributed over the years, nor that all sightings and interactions were reported.  Indeed, CO Califano testified that he was not surprised when the Plaintiff told him that he had been bitten by a rodent because he had previously heard reports of rodents in the facility.  (Califano Dep. 57:21–58:4.)  Furthermore, CO Califano testified that when he patrols at night, he occasionally sees mice in the dorms.  (Califano Dep. 101:3–12.)  Taken together, the formal and informal complaints as well as the testimony of CO Califano raises a genuine issue of fact as to whether there was more than a mere presence of rodents in the MOU.

The Defendant further asserts that, even if rodents did exist at the facility, they did not pose a risk of serious harm because after Solomon was bitten, although there was some blood on

11

his penis, there was no significant blood loss and the wound did not require stitching. Furthermore, the Defendant challenges the Plaintiff's assertion that his injury has resulted in degeneration, and claims that any lasting effects are psychological and not physical, suggesting that the injury suffered was not one indicative of a substantial risk of serious harm.  However, the seriousness of Solomon's specific injury is relevant to the issue of damages, not to whether a material issue of fact exists as to deliberate indifference.  As the Second Circuit has stated, the degree of seriousness that must be demonstrated for Section 1983 liability is an injury that has the possible consequences of death, degeneration, or extreme pain.  Chance 143 F.3d at 702. Here, the risk of injury contemplated under the Plaintiff's claim of deliberate indifference is that of an attack by a rodent, potentially carrying rabies or some other disease, on a pre-trial detainee at the NCCC facility.  Given the severity of harm that could result from contracting a disease such as rabies from a rodent bite, a reasonably jury could find that that rodent bites constitutes a serious harm.  See, e.g., Walton v. Fairman, 836 F. Supp. 511, 514–15 (N.D. Ill. 1993) (noting that a substantial risk of serious harm can exist where prison officials "allow[ed] conditions in which inmates are bitten by rats and other rodents, well-known carriers of diseases, including rabies").

### b.  Whether the State Officials had Culpable Intent

The Defendant contends that, not only was it unaware of any substantial risk, but that, even if such a risk existed, it took reasonable measures to abate the harm.

The Supreme Court has held that, with regard to the subjective prong, that "a prison official may be held liable . . .  for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Farmer, 511 U.S. at 847, 114 S. Ct. at 1984. "'Whether a

prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  Phelps v. Kapnolas, 308 F.3d 180, 186 (2d Cir. 2002) (quoting Farmer, 511 U.S. at 842, 114 S. Ct. at 1970).  "Prison officials may, of course, introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" Salahuddin v. Goord, 467 F.3d 263, 281 (2d Cir. 2006) (citing Farmer, 511 U.S. at 844, 114 S. Ct. 1970.).

Here, for the purposes of overcoming summary judgment, the record contains sufficient evidence to create a triable issue of fact as to whether the Defendant was aware of the substantial risk of serious harm.  As previously discussed, 11 formal complaints relating to rodents were filed within 23 months of the Plaintiff's injury, including a petition signed by 50 inmates.  In addition, both CO Pastucci and CO Califano testified that they occasionally saw mice in the jail and in the security office.  (Pastucci Dep. 37:12–16, 47:11–12; Califano Dep. 101:3–12.) Furthermore, as the Plaintiff points out, the Defendant's actions in response to Plaintiff's injury also demonstrate its awareness of the seriousness of the risk faced by the Plaintiff.  NCCC officials sent the Plaintiff to the NCCC infirmary for treatment, and he was then transported from the facility that night to the Nassau University Medical Center to receive additional rabies treatment.  Taken together, these facts may allow a fact-finder to conclude that officials at the NCCC were subjectively aware of the risk posed to the Plaintiff of being attacked by a rodent potentially carrying rabies or some other disease.

The Defendant also contends that, even if a substantial risk of serious harm existed, the Court should dismiss the Plaintiff's Section 1983 claim because the Defendant took reasonable measures to abate the harm.  The NCCC's IPM plan calls for several preventative measures to keep rodents out of the facility altogether, and the Defendant maintains that their IPM plan was maintained in a manner that reasonably protected Plaintiff from harm while serving the Defendant's legitimate penological interests of preventing inmates from using poisons or traps as weapons.

Courts are required to give deference to prison officials who are forced to act under understandable constraints to enforce jail regulations reasonably related to a legitimate penological interest.  See Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261–62, 96 L. Ed. 2d 64 (1987).  "Courts must evaluate four factors in making the reasonableness determination: [1] whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests."  Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir. 2006) (citing Turner, 482 U.S. at 90–91, 107 S. Ct. at 2254).

To refute the reasonableness of the IPM the Plaintiff points to evidence in the record that the IPM was insufficient in preventing rodents from entering the facility, and therefore cannot be considered a reasonable measure.  For example, despite regulations in place designed to keep the facility clean of conditions that would attract rodents, the Plaintiff alleges his MOU cell was filthy when he was placed there.  (Solomon Dep. 175:20–176:3, 176:4.)  The record also contains evidence that the cells of the MOU have gaps between the bottom of the cell door and

the floor large enough for rodents to pass through, and that the Defendant prevents the inmates from blocking this door gap.  (Upton Decl., Ex. C; Califano Dep: 91:8–14; Pastucci Dep. 34:6–21.)  In addition, the Plaintiff contends that the 11 formal complaints, 100 informal complaints, and testimony by CO Califano and CO Pastucci that they occasionally see mice in the facility are further evidence that the IPM was insufficient.

For its part, the Defendant contends that the IPM plan is a reasonable measure, and any insufficiency resulting from the IPM plan is due to necessary restrictions in the type of methods it can use to control the problem.  For example, NCCC officials and Bug Free technicians cannot place glue boards or poisons in any area where inmates have access to them because of the threat to inmate safety.  (Starke Dep. 40–41.)  With regard to the dangers posed by glue boards, Starke testified that:

> glue boards are very sticky, and what they do is they use that to hide shivs when they sharpen their tooth brushes and whatever they - - piece of metal or anything, that they stick it and hide it under their bunks, hide it under certain areas in theirs cell, and over the years we found when they had shakedowns, we found certain shanks that are used to cut other inmates and we had - - they were hidden by, you know, hiding undernearth with some type of - - something that would be sticky.

(Starke Dep. 38:16–39:3.)  Although placing poisons and glue boards in inmate access areas may be a more effective method of preventing rodents from accessing those areas and harming inmates, the Court finds that there is a "valid, rational connection" between the policy and the legitimate penological interest of inmate safety.  This is also true as to the Defendant's decision not to install door sweeps or any other type of covering over the gap between the cell door and the ground.  As Starke testified, door sweeps can be used as weapons, and any other type of blockage would affect ventilation.  (Starke Dep. 136:18–19; 136:24–137:7.)  The Court finds that the protection of inmates from harmful chemicals and the need to prevent inmates from using

15

poisons, glue traps, or door sweeps as weapons are legitimate penological interests that support the reasonableness of the IPM policy.

However, the Plaintiff also alleges that the insufficiency of the IPM plan is due to the NCCC's failure to adhere to the IPM plan requirements. If the alleged insufficiency is a result of not adequately implementing the policy, as opposed to the limitation on methods, the Plaintiff may be able to show that the measures taken by the Defendant to prevent rodents from biting inmates were not reasonable. Here, the Plaintiff has cited enough evidence to raise a genuine issue of fact for the jury as to whether the Defendant was adequately complying with the IPM plan, and whether the lack of compliance could have resulted in the alleged substantial risk of harm.

For example, the IPM policy states that "it is imperative that information regarding the presence of pests, or situations which may affect their harborage . . . . be brought to the attention of the [pest control company] as soon as possible. (Weinick Decl., Ex. O.) Starke testified about the procedure for notifying Bug Free of grievances, stating that when an inmate filed a grievance "it would go to a grievance officer, and a grievance officer would call me and I would send whoever, whatever the grievance is about, and if it was, we'll say, a Bug Free problem, I would have them go to that area." (Starke Dep. 54:10–20.) Starke also testified that he would not be told what the specific problem was, only that a rodent problem was reported in a particular area. (Starke Dep. 87:15–20.) Furthermore, Garcia, the contract exterminator for Bug Free, testified that Bug Free was also never informed about the specific allegations in the inmate grievances. (Garcia Dep. 32:6–18, 49, 62–64.) In fact, Garcia testified that he did not learn about the Plaintiff's rodent bite until he was contacted in connection with the instant suit. (Garcia Dep. 65.) Garcia stated that had he been informed of the specific problems, that inmates were finding

16

rodent parts and dropping in their food, and that they were being bitten by rodents, he would have "[sought] knowledge from someone more knowledgeable than [himself], like an entomologist, on what the jail could possibly do to correct a situation." (Garcia Dep. 62–63.) He further stated that if he had seen the information on the grievance forms, he would have been "extremely concerned on what [they] could possibly do to make a reduction or put control on it." (Garcia Dep. 65:2–4.)

Another example where the Defendant's actions may not have been reasonable is in allegedly choosing not to implement certain Bug Free recommendations. Garcia testified that Bug Free recommended that the Defendant maintain a specific number of monitors around the facility in rodent-breeding areas, and that the Defendant failed to follow that recommendation. (Garcia Dep. 54–55, 77; Upton Decl., Ex. G.) Garcia stated that maintaining this number of monitors outside the facility was important because "if you can kill them before they can get in, they can't get in." (Garcia Dep. 55:12–15.) Furthermore, Starke testified that, although they obtained extra monitors based on Bug Free's recommendation, they did not purchase the recommended amount of monitors. (Starke Dep. 106–07.)

Finally, the Plaintiff has presented evidence that raises a question of fact as to whether the Defendant reasonably enforces the Housekeeping Policy, which mandates that inmate cells are kept clean. (Weinick Decl., Ex. P.) At his deposition Starke acknowledged that there was a problem with prisoners hoarding food in their cell, but claimed that food in a cell does not raise the concern that rodents might enter. (Starke Dep. 126:22—25.) However, although he initially stated he did not know whether mice would enter the cells through the gap under the door, he later testified that he had received complaints about mice entering cells through the gaps. (Compare Starke Dep. 81:20–82:3 with Starke Dep. 135:15–24.) Based on this testimony that

prisoners allegedly hoard food in their cells and that mice can and have been known to enter cells through the gap, a reasonable jury could infer that by failing to prevent inmates from hoarding food in their cells, the Defendant did not reasonably abate the risk of harm.  Thus, whether the Defendant should have informed Bug Free about the specific nature of the grievances, adequately implemented Bug Free's recommendations, and reasonably attempted to prevent inmates from hoarding food in their cells, are issues of fact for the jury.

### 2.  As to Whether Nassau County is subject to <u>Monell</u> Liability

To assert a claim against a municipality pursuant to Section 1983, a plaintiff must satisfy the well-settled requirements of <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Under <u>Monell</u> and its progeny, a Section 1983 plaintiff must show that a violation of his rights by an employee or agent of a municipality was the result of a "policy or custom" of the municipality.  <u>Id.</u> at 694.  Conclusory allegations of municipal custom or policy are insufficient to satisfy this requirement.  <u>See</u> <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 536 (2d Cir. 1993) ("The mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." (quoting <u>Dwares v. City of New York</u>, 985 F.2d 94, 100 (2d Cir. 1993)); <u>Cerbelli v. City of New York</u>, 600 F. Supp. 2d 405, 411 (E.D.N.Y. 2009) (holding same).  This rule is applicable with regard to a Section 1983 claim that the conditions of a prisoner's confinement violated his constitutional rights.  <u>See</u> <u>Maxwell v. City of New York</u>, 108 Fed. App'x 10, 12 (2d Cir. 2004) (dismissing conditions of confinement claim against a municipality for failure to present evidence of custom or policy of causing or permitting poor conditions); <u>Byas v. New York City Dept. of Correction</u>, 173 F.R.D. 385, 388 (S.D.N.Y. 1997).  Specifically in the prison context, the policy in question must be implemented by a figure that

"fairly represents official policy." Monell, 436 U.S. at 694.  In addition, a municipality's failure to train employees to properly protect individuals' constitutional rights can also serve as a basis for municipal liability under Monell.  Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007).

In addressing this issue, both parties focus on whether the Plaintiff can prove a constitutional violation.  As discussed above, the Court finds that the Plaintiff has provided enough evidence to raise a genuine issue of fact as to whether his Fourteenth Amendment Due Process rights were violated.  There is no dispute that the IPM policy was adopted by Nassau County, and that Nassau County was the entity that contracted with Bug Free to implement the IPM plan at the NCCC.  However, because neither party submitted evidence as to whether the allegedly unconstitutional implementation of the policy was the result of a failure to train or the actions of an individual who could not be said to "fairly represent official policy," the Court finds that there are issues of fact as to whether Nassau County is subject to liability.  Thus, summary judgment dismissing the Section 1983 claim against Nassau County is denied.

## C.  State Law Negligence Claims

The Defendant also asks this Court to grant summary judgment as to the Plaintiff's state-law negligence cause of action on two grounds.  First, the Defendants argue that because the Plaintiff has failed to state a valid federal cause of action, this Court should decline to exercise supplemental jurisdiction over the Plaintiff's state-law cause of action for negligence.  Second, the Defendant contends that even if the Section 1983 claim is valid, the Plaintiff has failed to state a viable negligence claim under New York law.  In turn, the Court addresses, and rejects, each of these arguments.

The Defendant's procedural argument relies on the presumed dismissal of the Plaintiff's Section 1983 cause of action.  However, because this Court denies summary judgment to the Defendant as to the Section 1983 cause of action in this case, the procedural argument has no merit.  This Court will exercise supplemental jurisdiction over the Plaintiff's state-law negligence claim, as it arises from the same nucleus of operative facts as the Plaintiff's federal cause of action. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) ("[A] federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'") (quoting Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138, 16 L. Ed. 2d 218 (1966)).

In regard to the substance of the state law negligence claim, the Defendants seek dismissal on the ground that the Plaintiff has failed to sufficiently state a claim upon which relief can be granted.  A negligence claim will survive summary judgment when a plaintiff alleges facts that establish that the defendant had a duty to protect the plaintiff, the Defendant breached that duty, and that breach caused the plaintiff to be injured.  See Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 215 (2d Cir. 2002); Ruiz v. Griffin, 71 A.D.3d 1112, 898 N.Y.S.2d 590 (2d Dep't. 2010).

It is undisputed that, in the prison context, the prison facility, and the County that manages it, owes a duty to its inmates to "maintain its property in a reasonably safe condition in view of all the circumstances, including the likelihood and seriousness of a potential injury and the burden of avoiding such risk." Covington v. State, 54 A.D.3d 1137, 1138, 863 N.Y.S.2d 852, 853 (3d Dep't 2008).  As Plaintiff was a pre-trial detainee of the NCCC, Nassau County

owed Plaintiff a duty to maintain its facility in a reasonably safe condition.  However, the County is not required to insure against every injury which may occur.  Instead it is only required to act reasonably in the maintenance of its facility to provide safe conditions. Id.   On this point the Defendant maintains that by utilizing the services of Bug Free and other preventative measures pursuant to the IPM plan, it took reasonable measures to prevent harm to the Plaintiff and other inmates from rodent bites.

The Defendant contracted with Bug Free who visits the facility weekly; produced service reports from December 2006 through February 2007 (time just prior to the alleged injury); produced a grievance report evidencing that NCCC treated a reported problem cell; and took additional steps to prevent rodents from entering the facility such as dismantling a kitchen wall, sealing facility windows, and performing regular maintenance of the facility.  The Defendant relies on the Appellate Division's ruling in Covington affirming a decision by the Court of Claims that a defendant prison was not negligent where they took similar precautions in controlling rodent activity.  Based on the holding in Covington, the Defendant argues that "New York Courts have already determined that the Defendants' actions are reasonable and that Plaintiff cannot prove negligence with such evidence presented against him." (Def. Br. at 15.) However, the reasonableness of the defendant's actions in Covington was determined after all the proof was presented at the trial.  Here, as discussed in detail above, the Plaintiff has raised a number of issues as to whether the preventative measures were sufficiently implemented.  If the Defendant knowingly ignored recommendations by Bug Free; failed to follow its own policy in reporting rodent related grievances; and failed to adequately enforce the rules against keeping food and other items in cells that may attract rodents, a jury could find that the Defendant acted negligently in failing to prevent the Plaintiff's injury.

21

## IV.  CONCLUSION

For the foregoing reasons, it is hereby

      **ORDERED,** that the Defendant's motion for summary judgment dismissing the case

pursuant to Fed R Civ P 56(c) as to Defendant Nassau County is denied in its entirety, and it is

further

      **ORDERED,** that the Defendant's motion for summary judgment dismissing the case

pursuant to Fed R Civ P 56(c) as to defendants NCCC, Sheriff Edward Reilly, and Undersheriff

Michael Sposato, is granted in its entirety, and it is further

      **ORDERED**, that the Clerk of the Court is directed to amend the caption **as follows:**

> **UNITED STATES DISTRICT COURT**
> **EASTERN DISTRICT OF NEW YORK**
> --------------------------------------------------------X
> PETER SOLOMON,
>
>                        Plaintiff,
>               -against-
>
> NASSAU COUNTY
>                   Defendant.
> --------------------------------------------------------X

**SO ORDERED**.
Dated: Central Islip, New York
January 7, 2011

                              __/s/ Arthur D. Spatt_____
                               ARTHUR D. SPATT
                       United States District Judge